IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Joseph Myers,

      Plaintiff,

      v.                       Case No. 2:04-cv-966

Iron Workers District
Council of Southern Ohio &
Vicinity Pension Trust,

      Defendant.

OPINION AND ORDER

This is an action for payment of disability benefits filed under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B). Plaintiff Joseph Myers seeks the payment of a disability pension under the terms of the Iron Workers District Council of Southern Ohio & Vicinity Pension Trust ("the Trust"), named as the defendant in this case. On March 29, 2005, this court entered an order setting aside the previous entry of default. Defendant's motion (Doc. #18) to amend its reply to the motion to set aside the entry of default is granted. This matter is before the court on the cross motions of the parties for judgment on the administrative record.

I. Standard of Review

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court held that a denial of benefits challenged under ¶1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case the more deferential arbitrary and

capricious standard of review applies. The standard of de novo review is also applicable to the plan administrator's factual determinations unless the plan explicitly vests fact-finding discretion in the plan administrator. Rowan v. Unum Life Insurance Co. of America, 119 F.3d 433, 435-36 (6th Cir. 1997).

When conducting a de novo review, the court simply decides whether or not it agrees with the decision under review. Perry v. Simplicity Engineering, 900 F.2d 963, 966 (6th Cir. 1990). Under this standard, the court must take a "fresh look" at the administrative record. Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609, 616 (6th Cir. 1998). The de novo standard of review applies to the factual determinations as well as to the legal conclusions of the plan administrator. Id. at 613.

Under the "arbitrary and capricious" standard, a determination will be upheld if it is rational in light of the plan's provisions. Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir. 1996). When it is possible to offer a reasoned explanation for a plan administrator's decision based upon the evidence, that decision is not arbitrary and capricious. Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989). In the specific context of a claim for disability benefits, administrators are not required to accord special weight to the opinions of the plaintiff's treating physician, or to offer an explanation when they credit reliable evidence that conflicts with a treating physician's evaluation. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

Regardless of which standard of review applies, the court is

2

limited to a consideration of the evidence which was included in the record before the plan administrator.  See Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health & Welfare Trust Fund, 203 F.3d 926, 932 (6th Cir. 2000); Wilkins, 150 F.3d at 616 (de novo review limited to record before plan administrator); Smith, 129 F.3d at 863 (review under "arbitrary and capricious" standard considers only facts known to plan administrator at time of decision).

A finding that discretionary authority has been given to the plan administrator does not depend on the plan's use of the word "discretionary" or any other magic word.  Williams v. International Paper Co., 227 F.3d 706, 711 (6th Cir. 2000).  Rather, courts must focus on the breadth of the administrator's power in determining whether the plan includes a clear grant of discretion to the administrator to determine eligibility for benefits or to interpret to construe the terms of the plan.  Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998).

The parties are in agreement that the terms of the plan at issue in this case are sufficient to permit the "arbitrary and capricious" standard of review.  Under Section 3.10 of the Iron Workers District Council of Southern Ohio & Vicinity Pension Plan ("the Plan"), the determination of total and permanent disability is given to the trustees of the plan "in their sole and absolute judgment[.]" Under Section 6.03(a) of the Plan, the "Trustees shall, subject to the requirements of the law, be the sole judges of the standard of proof required in any case and of the application and interpretation of this Plan, and decisions of the trustees shall be final and binding on all parties." Admin. Record

3

(hereinafter "Record"), p. 9.  Section 6.03(c) provides:

> All questions or controversies of whatsoever character arising in any manner or between any parties or persons in connection with this Plan or its operation, whether as to any claim for benefits, as to the construction of the language of this Plan or any rules and regulations adopted by the Trustees, or as to any writing, decision, instrument or account in connection with the operation of the Plan or otherwise, shall be submitted to the Board of Trustees for decision.  In the event a claim for benefits has been denied, no lawsuit or other action against the Fund or its Trustees may be filed until the matter has been submitted for review under the ERISA-mandated review procedure set forth in Section 6.04.  The decision on review shall be binding upon all persons dealing with the Plan or claiming any benefit thereunder, except to the extent that such decision may be determined to be arbitrary or capricious by a court or arbitrator having jurisdiction over such matter.

Record, p. 10.

This language is sufficient to warrant the use of the arbitrary and capricious standard of review.  However, plaintiff argues that this court should apply the de novo standard of review in this case due to the alleged failure of the Trust to comply with the notice provisions of 29 U.S.C. §1133(1).

In this case, plaintiff's application for benefits dated March 24, 2003, was received by the Trust on April 17, 2003.  Record, pp. 12, 22.  At the meeting held on May 13, 2003, the trustees instructed the administrative office to schedule plaintiff for an impartial medical examination in accordance with Section 3.10(b) of the Plan.  Record, p. 7.  Plaintiff was advised of this decision by letter dated May 23, 2004.  Record, p. 26.  The medical examination was conducted by Dr. Ronald Klein, M.D., of Kettering Workers Care, on June 30, 2003.  Record, pp. 27-30.  By letter dated July 14, 2003, plaintiff was notified that his request for a disability

4

pension was denied by the trustees at their meeting on July 8, 2003, and that he had a right to appeal that decision. Record, p. 34. The letter did not include any explanation of the reasons for the denial of benefits.

The review procedures provided by the Plan include two levels of appeals. In August of 2003, plaintiff submitted additional materials in support of an appeal from the denial of benefits. On October 20, 2003, plaintiff was provided with a copy of the report prepared by Dr. Klein. Record, pp. 29-30, 61. By letter dated December 22, 2003, plaintiff was advised that the trustees had denied his claim for benefits. Record, pp. 65-66. The letter stated that Dr. Klein's report was provided to the board of trustees, and that the board thereafter, by unanimous vote, determined that plaintiff "did not meet the Pension Trust's definition of disability." A copy of Dr. Klein's report, the Plan language defining disability, and the procedures for filing claims and appeals were also included with the letter. The notification letter also stated, "If additional evidence of total disability is received, the Board of Trustees will reopen your claim, and again, completely review your file.... In the meantime, and in the absence of such additional evidence, the Board of Trustees, acting as the Pension Plan Administrator, have denied your claim for a Disability Pension."

After retaining counsel, plaintiff indicated that he would be filing an additional appeal. By letter dated February 19, 2004, counsel for plaintiff received confirmation that the Trust would not impose any deadline date for submitting an appeal for at least sixty days. Record, p. 80. By letter dated April 14, 2004,

counsel indicated that she would submit additional physician reports prior to June 19, 2004, the expiration of the normal appeals period, and the Trust indicated in response that counsel could have additional time if she required it. Record, p. 81. Plaintiff submitted additional records in support of the appeal on June 17, 2004. Record, p. 82.

On July 13, 2004, the board ruled on this appeal and denied disability benefits. Plaintiff states in his complaint that he learned the day after the July board meeting that the board had reviewed his appeal and denied his application for benefits. Complaint, ¶ 13. The decision is reflected in the minutes of the July 13th meeting. See Record, p. 188. However, plaintiff contends that he never received a written decision, and no such document is included in the administrative record before the court.

Under §1133(1), the Plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant[.]" Under the regulations contained in 29 C.F.R. §2560.503-1, the plan administrator is required to notify a claimant for disability benefits of the plan's adverse benefit determination not later than forty-five days after receipt of the claim, although the period may be extended for up to sixty days for circumstances beyond the control of the plan. 29 C.F.R. §2560.503-1(f)(3). The plan must provide the claimant with written or electronic notification of any adverse benefit determination, and the notice must include the specific reason or reasons for the adverse determination, reference to the specific plan provisions on

6

which the determination is based, a description of any additional materials or information necessary to perfect the claim, and a description of the plan's appeal procedures.  29 C.F.R. §2560.503-1(g).

Similar requirements apply to a review or appeal of an adverse benefit determination.  See 29 C.F.R. §2560.503-1(h)-(j).  The former version of 29 C.F.R. §2560.503-1(h)(4) provided that if the decision on review was not furnished to the claimant within the time limits provided in the regulation, the "claim shall be deemed denied on review."  Under this provision, "a plan administrator's failure to adhere literally to the regulatory deadlines renders the claimant's administrative remedies exhausted by operation of law and consequently permits the claimant to seek review in the federal courts without further delay.  See Nichols v. Prudential Ins. Co. of America, 406 F.3d 98, 106 (2d Cir. 2005).  The "deemed denied" provision has since been replaced by a provision which states that in the case of a failure to follow the claims procedures specified in the regulation, the claimant "shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under [§1132(a).]"

A failure to strictly comply with the requirements of §1133 does not necessarily require a reversal of the plan administrator's benefit determination.  As the Sixth Circuit noted in Kent v. United of Omaha Life Ins. Co., 96 F.3d 803, 807 (6th Cir. 1996), "the courts have recognized in E.R.I.S.A. cases that procedural violations entail substantive remedies only when some useful purpose would be served."  Alleged procedural defects do not warrant reversal where a remand would represent a useless

7

formality, or where the plan administrator substantially complied with the procedural requirements, such that the claim communications as a whole were sufficient to fulfill the purposes of §1133 despite the presence of a technical defect. Id.; McCartha v. National City Corp., 419 F.3d 437, 447 (6th Cir. 2005)(no remand required for procedural defects where plan ruled on appeal from denial of benefits).

However, courts are divided on the issue of whether the failure to render a decision on an appeal, thereby resulting in an appeal which was "deemed denied" under the former regulation, precludes a deferential standard of review. For example, in Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 631-32 (10th Cir. 2003), the court applied de novo review, stating, "When the administrator fails to exercise his discretion within the required timeframe, the reviewing court must apply Firestone's default de novo standard." The court also adopted a substantial compliance rule which permits deferential review if the plan administrator is in substantial compliance with the regulations, or where, despite the failure to issue a written decision on the appeal, the administrator's initial denial and statement of reasons can effectively be applied to the appeal and the claimant presents no meaningful new evidence or raises no significant new issues on appeal. Id. at 634-35. See also Nichols, 406 F.3d at 109 (absent substantial compliance with deadlines, de novo review applies on grounds that inaction is not a valid exercise of discretion and leaves court without any decision or application of expertise to which to defer); Jebian v. Hewlett-Packard Emp. Ben. Org. Income Protection Plan, 349 F.3d 1098, 1109-08 (9th Cir.

2003)(administrator's failure to communicate with plaintiff in timely manner triggers de novo review); Gritzer v. CBS, Inc., 275 F.3d 291, 295-96 (3d Cir. 2002)(no deference to plan administrator's justification issued only after commencement of litigation).

Other courts have applied a deferential standard of review even though there are procedural irregularities. See McGarrah v. Hartford Life Ins. Co., 234 F.3d 1026, 1030-31 (8th Cir. 2000)(mere presence of procedural irregularity is not enough to strip a plan administrator of the deferential standard of review; claimant must also present evidence that the procedural irregularity was sufficient to undermine confidence in the integrity of the decision-making process); Southern Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 101 (5th Cir. 1993)(deferential standard of review applies to "deemed denied" claim).

The Sixth Circuit in Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1998), noting the "deemed denied" language of former §2560.503-1(h)(4), held that the standard of review is no different whether the appeal is actually denied or is deemed denied. However, in University Hospitals of Cleveland v. Emerson Electric Co., 202 F.3d 839, 846 n. 3 (6th Cir. 2000), the court commented in dicta that "there is undeniable logic in the view that a plan administrator should forfeit deferential review by failing to exercise its discretion in a timely manner." It is unclear how the Sixth Circuit and other courts will resolve the issue of what constitutes the appropriate standard of review for failure to comply with the regulatory requirements now that former §2560.503-1(h)(4) has been replaced by §2560.503-1(l). At least one district

9

court has concluded that in light of the change in the regulatory language, the failure to issue a timely decision on appeal requires de novo review.  See Reeves v. Unum Life Ins. Co. of America, 376 F.Supp.2d 1285, 1293-94 (W.D.Okla. 2005).

The Trust did not strictly comply with all of the regulatory requirements in this case.  Plaintiff did not receive a timely written explanation of the board's decision in July of 2003.  The first written decision was not provided until the conclusion of plaintiff's first appeal in December of 2003, long after the regulatory deadline for providing a statement of reasons had passed.  That decision, although untimely in relation to the plaintiff's initial application for benefits and the filing of his first appeal, was otherwise in substantial compliance with the requirements for a written decision.  It explained that the request for benefits was being denied because plaintiff did not meet the Plan's definition of disability.  Included with the letter was a copy of Dr. Klein's report, which was in effect incorporated by reference as a statement of reasons for the denial.  The letter also included the Plan language defining disability and the procedures for filing claims and appeals.

The court notes that there is no evidence that the above procedural deficiencies deprived plaintiff of the opportunity to pursue appeals from the board's decisions.  Plaintiff was permitted to submit additional materials after the initial decision in July of 2003, and after the December, 2003, letter, he was allowed to present new evidence, with the assistance of counsel, in support of his second appeal.  Plaintiff never received a written decision on his second and final appeal, and thus, as to that appeal, there was

10

no substantial compliance with the regulations requiring a written decision.  However, remanding the matter to the trustees for a written statement of reasons would serve no useful purpose in this case, since, in all likelihood, any statement of reasons would simply repeat the reasons given in letter of December of 2003, including Dr. Klein's report, and the arguments made in the Trust's motion for judgment on the administrative record.

Considering the conflicting and potentially changing law on the subject of what standard of review applies in a case involving the procedural deficiencies noted above, the court will apply the de novo standard of review in this case.

II. Administrative Record

In support of his application for benefits, plaintiff submitted a Disability Pension Examination Report signed by Dr. Chou-Chi Lin, his general physician, on March 24, 2003.  Record, p. 12.  This form contains Dr. Lin's finding that plaintiff is permanently and totally disabled due to a diagnosis of "Peripheral Neuropathy, Loss Imbalance, Sequalae Viral Menengitis [sic]."  Dr. Lin further stated that plaintiff had viral meningitis on September 14, 2001, and that "[s]ince then he claim [sic] has numbness, tingling on feet and always losses [sic] balance while walking[.]"  Dr. Lin indicated that plaintiff first consulted him for this condition on February 18, 2003.  Dr. Lin also completed an "Attending Physician's Statement" on which he noted that plaintiff "continuously complains pain in lower extremities, feels numbness on lower & upper extremities & lately he feel [sic] loss of balance, [illegible] staggering & afraid if he works may cause imposed danger to co-worker."  Record, p. 21.  He further noted:

11

"pt. loss equilibrium & easy falling [illegible] & claims dangerous to the working environment (possible will injure co-worker)[.]"

Following the denial of benefits on July 8, 2003, plaintiff submitted a letter from Dr. Lin simply stating that plaintiff was his patient and that he could not do iron work any longer due to viral meningitis. Record, p. 37. Plaintiff later submitted Dr. Lin's treatment notes. The record also includes an affidavit from Dr. Lin, in which he stated that on January 6, 2003, he saw plaintiff "for complaints of numbness in both of his feet and loss of coordination that was causing him to fall frequently." Record, p. 168. Dr. Lin referred plaintiff for an evaluation by Dr. Martin, Taylor, a neurologist. Dr. Lin expressed the opinion that plaintiff "cannot safely perform ironwork, or other building trades, because of numbness in his legs and feet, peripheral neuropathy, and loss of equilibrium" and that plaintiff's peripheral neuropathy, numbness in his legs and feet and loss of equilibrium places plaintiff "at significant risk of causing injury to himself or to others should he continue to perform ironwork or other building trades."

The record also contains a decision from the Unemployment Compensation Review Commission which concluded that plaintiff was entitled to unemployment compensation benefits because he was able to work and actively seeking suitable work as required under Ohio law. Record, pp. 54-57. In the decision, the Commission refers to a letter from Dr. Lin dated May 9, 2003, in which he stated:

> I have been treating Joseph L. Myers since November 10, 1999. The condition I am currently treating him for is complication for meningitis which occurred on September 11, 2001. Mr. Myers is able to work, although he has difficulty with his balance and coordination. His

12

mobility on a construction job raises some concerns as to
the safety of himself and other workers. Therefore, it
is best that he focus his employment on positions that do
no[t] present such hazards, [i.e.], rough terrain,
numerous mobile construction equipment, mud and unequal
elevations. It is my recommendation that he does not
work iron work and focus his job search on other
employment which he is able to do.

Record, p. 55.

Plaintiff submitted a letter dated August 29, 2003, from Dr.
Kevin Lake, D.O., who stated that he last examined plaintiff on
August 27, 2003, and plaintiff was found to have viral meningitis
and a low B12 level, for which Dr. Lake recommended oral vitamins.
Dr. Lake stated that plaintiff is unable to do iron work
indefinitely. Record, p. 39. Plaintiff also sent a letter dated
August 19, 2003, from Dr. George Rutan, a podiatrist, who offered
the opinion that plaintiff, due to "peripheral neuropathy and other
associated previous diagnoses ... should not be performing iron-
workers' duties as he would be at risk for injury." Record, p. 42.

The record includes the treatment notes of Dr. Veda
Ramakirshnana, M.D. and Dr. Radu Savaenu, M.D., psychiatrists who
treated plaintiff for difficulty with concentration, forgetfulness,
sleeplessness, mood swings and depression. Record, pp. 136-166.
The record includes a mental examination completed on August 21,
2003, to test for levels of orientation, registration, attention
and calculation, recall and language. Plaintiff received the
maximum possible score. Record, p. 137.

Dr. Ramakirshnana's notes also include a questionnaire called
the "Beck Inventory" completed by plaintiff on August 18, 2003.
Record, p. 138. Plaintiff checked boxes indicating that he did not
feel sad, had no thoughts of killing himself, was no more irritated

13

now than he ever had been, had not lost interest in other people, and had not lost his appetite.  He indicated that he puts off making decisions more than he used to, that he was worried that he was looking old or unattractive, that he doesn't sleep as well as he used to and gets tired more easily, that he worries about physical problems such as aches and pains, and that he has to push himself very hard to do anything.

Plaintiff also filed a Disability Pension Examination Report signed by Dr. Radu Savaenu on August 4, 2003.  Record, p. 40.  On this form, Dr. Savaenu offered the opinion that plaintiff is totally disabled based mainly on neurologic impairment, including difficulty concentrating and interrupted sleep.  Her diagnosis included depression.  She notes that plaintiff "reports various neurological symptoms which ... have been hindering his work as an iron worker."

The record also includes an evaluation by Paul R. Turner, a physical therapist.  Record, p. 171-79.  Mr. Turner completed a functional capacity evaluation based on subjective information provided by plaintiff and various physical tests completed by Mr. Turner.  According to the report, plaintiff

> demonstrated alexic balance and staggered mobility during the assessment" which "would render him and potentially his co-workers unsafe for such heavy work as associated with the climbing and unlevel surfaces balancing requirements of an iron construction worker.  These risks would be further increased with elevation above ground level.  His current demonstrated balance deficits would make him an inappropriate candidate for iron construction worker employment involving climbing to significant heights or requiring balance stability on unlevel or unsteady surfaces.

Record, p. 171.

14

Mr. Turner further reported that plaintiff was able to demonstrate positional tolerances of constant sitting, frequent push/pulling, standing, ambulation, climbing with upper extremity support, balancing, stooping, kneeling, overhead and floor level reaching in standing, squatting and standing trunk pivoting and occasional crouching. His aerobic capacity during treadmill testing was average. Mr. Turner identified deficits in the form of a standing lateral trunk shift and depressed left shoulder limited right elbow extension, diminished deep tendon reflexes in the bilateral lower extremities, and poor dynamic standing balance for medial/lateral and anterior/posterior unlevel surfaces/rocker boards. Mr. Turner further commented:

> Mr. Myers was able to demonstrate material handling within the Heavy category of work on both a maximum-occasional and frequent basis. He was able to demonstrate tolerance of balancing activities, ladder climbing, and squatting on a frequent basis. But his stability was poor and displayed excessive medial-lateral and anterior-posterior balance disturbances that would be inconsistent and unsafe with unlevel ground, high level platforms, and climbing associated with iron construction employment. He also demonstrated poor independent balance without upper extremity support for occasional crouching.

Record, p. 174.

Plaintiff also submitted an employability assessment completed by Beal D. Lowe, Ph.D., a specialist in psychological, vocational and rehabilitation services. Record, pp. 184-85. Dr. Lowe stated that plaintiff was referred to him for an assessment of his "capacity to perform his usual employment as an Ironworker." Record, p. 184. He reviewed the affidavit of Dr. Lin, the August 18, 2003, report of Dr. Taylor, and the evaluation of Paul Turner. Dr. Lowe referred to the United States Department of Labor data

15

concerning the job of ironworker, which indicated that this
employment requires the capacity to frequently climb and balance
and to walk on unsteady or uneven surfaces.  He noted that the
medical opinions he reviewed found that plaintiff lacked the
capacity to climb, balance or walk on uneven surfaces, and
concluded that plaintiff lacked the capacity to perform his usual
employment as an ironworker or other building trades.  Record, p.
185.

The record also includes the results of plaintiff's
Electromyographic ("EMG") examination conducted on February 28,
2003. Record, p. 115. Plaintiff was referred to Dr. Martin Taylor
for a neurology consultation.  In a letter dated March 31, 2003,
Dr. Taylor described the results of his initial examination of the
plaintiff.  Record, pp. 107-08.  Dr. Taylor described the results
of the EMG as indicating "mild distal intency prolongation of the
peroneal motor nerves and medial platars as well as low amplitude
peroneal motor" and that "neurosensory potentials were thought to
be essentially normal." Record, p. 107.  Dr. Taylor reported that
plaintiff was alert, oriented and attentive with normal language
and cognition.  The motor exam revealed that "tone and bulk are
normal throughout with full strength and no drift."  Record, p.
108.  Dr. Taylor indicated that on sensory exam, "the patient
reports decreased pinprick and temperature sensation distal to the
mid portion of the feet."  Plaintiff had normal vibratory
sensation, and reflexes were "actually sightly brisk at the
ankles." The coordination exam revealed normal finger to nose and
rapid alternating motion, and heel to shin.  Dr. Taylor noted that
plaintiff swayed on gait testing, and had difficulty with tandem.

Dr Taylor recorded his impressions of the examination as follows:

> Gait disorder and bilateral feet numbness. He appears to have a sensory neuropathy based on examination and mild changes seen on nerve conduction testing. He has no known risk factors for neuropathy. Given his report of significant balance problems which are seen on examination, I would expect to see vibratory sensation changes in the distal legs supporting a large fibroneuropathy. He actually has good sensation in the feet on vibration, therefore, I am concerned about the possibility of an associated central nervous system lesion occurring in the cervical spine. The patient's reflexes are not depressed at the ankles also as I would expect with the typical neuropathy.

Record, p. 108. Dr. Taylor referred plaintiff for an MRI examination.

In a letter dated April 25, 2003, Dr. Taylor reported on plaintiff's follow-up examination. Record, pp. 110-11. Dr. Taylor noted that an MRI of plaintiff's cervical spine revealed a mild herniated disc that does not cause central canal stenosis. Plaintiff complained of weakness in his left hip. The strength in plaintiff's left leg was "at least 4/5" and he had full strength in his right leg. Dr. Taylor also observed that strength was normal in the left upper extremity, and that plaintiff's reflexes were symmetrical in the upper extremities, and slightly brisker at the left knee compared to the right. Under "IMPRESSION," Dr. Taylor noted "Idiopathic sensory neuropathy. This may end up being inherited in nature as extensive testing has revealed no abnormalities." He recommended an MRI brain scan to further investigate the new onset of left hip weakness. A report of this MRI is included in the record at pages 129-130.

In a letter dated May 2, 2003, Dr. Taylor noted that the MRI

showed "mild bilateral paraventricular white matter changes."
Record, p. 105.  Dr. Taylor reported that plaintiff's

> strength objectively actually feels better today.  It is
> essentially normal in the left leg with just some give
> away at the hip.  His reflexes are slightly brisk on the
> left but he has fairly symmetric ankle jerks with about
> two to three beats of clonus on each side and not more
> sustained clonus as seen with his previous examination.
> His toes are down going on both sides.

Record, p. 105.  He noted that the mild left leg changes seen on
examination associated with a report of weakness was "most likely
secondary to [the] previous meningitis."  Dr. Taylor stated that
the meningitis may have resulted in associated encephalitis which
could cause some of the white matter changes seen on the MRI.

Dr. Taylor's report of plaintiff's next examination is dated
August 18, 2003.  Record, p. 104.  Dr. Taylor noted that plaintiff
"has actually been doing fairly well with no significant problems
with weakness in his legs" and that plaintiff reported "significant
improvement after increasing his exercise."  Dr. Taylor noted that
plaintiff "continues to have problems with balance" and that
plaintiff had concerns about his job as an ironworker, which
required him to work in high places, including walking iron or on
uneven surfaces.  The examination revealed that plaintiff "has good
strength in the lower extremities with normal ambulation.  He has
mild problems with tandem."  In regard to plaintiff's ability to
perform his job, Dr. Taylor stated, "I have concerns about him
walking on high or uneven surfaces.  I would recommend he return to
work with these restrictions."

The last report from Dr. Taylor is dated October 2, 2003.
Record, p. 103.  Plaintiff reported on this visit that he was
experiencing changes in the sensation in his feet with a tingling

18

to burning sensation. Dr. Taylor increased the dosage of plaintiff's medication (Neurontin) which had been previously prescribed by Dr. Lin.

The Trust exercised its right under the plan to obtain an independent medical examination. Plaintiff was examined on June 30, 2003 by Dr. Ronald S. Klein, who is a board-certified occupational medicine physician, family practitioner and independent medical evaluator. Dr. Klein stated in his report that he asked plaintiff numerous questions to test his recall, including past and present dates and times, and plaintiff was able to answer them and recall dates without any seeming difficulty. Record, p. 29. Plaintiff made a "rather wide stance" when asked to stand, and he made "erratic sort of imbalanced movements with a wide gait" while walking around the room. However, Dr. Klein also observed that when plaintiff left the building, "he seemed to walk with a normal gait without any seeming difficulty and walked actually rather quickly."

Dr. Klein further stated in his report that plaintiff's "sensory examination is completely intact to vibratory and light touch and pinprick." Plaintiff's reflexes were symmetrical throughout. Dr. Klein also noted that there was no evidence of muscle wasting, that the strength testing was symmetrical throughout, and that the measurements of plaintiff's calves were within normal physiologic variation. Record, p. 29. Plaintiff was able to stand on his toes and balance on his heels briefly. Record, p. 30. Testing of plaintiff's cerebellar functions revealed no evidence of palmar drift, with normal finger-to-nose, and plaintiff was able to stand perfectly still without any

19

wavering or evidence of balance problems with his eyes closed.

Dr. Klein also obtained copies of plaintiff's EMG examination and neurological consultation from Dr. Taylor. Dr. Klein noted that the EMG studies performed on February 28, 2003, revealed "very slight prolongation of the distal sensory latencies with normal motor velocities" which could be interpreted as a "possible slight peripheral sensory neuropathy of unknown etiology[.]" Dr. Klein also noted that the plaintiff's MRI examination revealed some "mild bilateral periventricular white matter changes" which may have been caused by the meningitis or some other factor such as plaintiff's history of smoking. Dr. Klein stated that it "is difficult to ascertain what is the true etiology of Mr. Myers' complaints as, if indeed his viral meningitis had caused his symptoms, it certainly should have caused them earlier in the process instead of a year and a half later." Dr. Klein also observed that plaintiff's "studies do not support the severity of his complaints." In regard to plaintiff's abilities to perform duties as an iron worker, Dr. Klein noted that "it is again difficult to ascertain how much true difficulty he is having[.]" He recommended that surveillance be considered before any final determination, "as it would appear that he is capable of more than he lets on."

III. Merits of Claim

Plaintiff applied to the Trust for a disability pension. Under Section 3.10(a) of the Plan, a participant may retire on a disability pension if he has at least five pension credits, has worked in covered employment for at least 500 hours in the twenty-four months prior to the time he became disabled, and is permanently and totally disabled as defined in Section 3.10(b).

20

The Trust does not dispute that plaintiff meets the first two criteria. However, the Trust argues that plaintiff fails to meet the requirements for permanent and total disability.

Section 3.10(b) of the Plan defines total and permanent disability as follows:

> A Participant shall be deemed to be totally and permanently disabled only of the Trustees, in their sole and absolute judgment, find on the basis of medical evidence, that:
>
> (i) he has been totally disabled by bodily injury or disease, so as to be prevented thereby from engaging in further work as an iron worker or as any other type of building trades craftsman; and
>
> (ii) such disability will be permanent and continuous for the remainder of his life[.]

Record, p. 7.

Under Section 6.02 of the Plan, the "Participant or Pensioner shall furnish, at the request of the Trustees, any information or proof reasonably required to determine his benefit rights." Record, p. 9. This language indicates that under the Plan, the trustees do not have the burden of producing evidence that the applicant is not disabled; rather, the applicant must produce evidence sufficient to show that his condition meets the definition of disability contained in the plan. See Ruttenberg v. U.S. Life Ins. Co. in City of New York, 413 F.3d 652, 663 (7th Cir. 2005)(holding that ERISA plaintiff seeking to enforce benefits under the policy bears burden of proving his entitlement to contract benefits); Seiser v. UNUM Provident Corp., No. 04-1177 (unreported), 135 Fed.Appx. 794 (6th Cir. April 22, 2005)(upholding district court's conclusion that plaintiff bore burden to prove eligibility for disability under the terms of the policy)(citing

21

<u>Miller v. Metro. Life Ins. Co.</u>, 925 F.2d 979, 985 (6th Cir. 1991)).

The evidence from Dr. Lin does not carry weight toward establishing plaintiff's disability. Dr. Lin is plaintiff's general physician, and his opinion is based on plaintiff's subjective reports of his symptoms. There is no evidence that Dr. Lin ever performed any tests to confirm plaintiff's symptoms. <u>See Wilkins</u>, 150 F.3d at 614 (noting that no objective tests demonstrated that plaintiff was disabled in upholding denial of benefits). Likewise, the record does not show how Dr. Lake is qualified to offer an opinion regarding plaintiff's alleged disability. His affidavit contains few details concerning his treatment of plaintiff, and fails to indicate that he had done any testing to identify the nature of plaintiff's condition. His conclusory opinion is entitled to little or no weight. The same can be said of Dr. Rutan's opinion. Dr. Rutan is a podiatrist, not a medical doctor, and he offers a conclusory opinion, unsupported by any clinical observations or examination results.

The records of Dr. Ramakirshnana and Dr. Savaenu also fail to show that plaintiff is disabled. These doctors were treating plaintiff primarily for depression, although they were also reportedly treating plaintiff for mood swings, sleeplessness, and memory problems. Although Dr. Savaenu states that plaintiff is disabled due to a "neurologic impairment," there is no evidence that these doctors ever treated plaintiff for any neurological impairment to physical movement, such as lack of balance.

The psychiatrists' opinions are, of necessity, based in large part on subjective information related to them by plaintiff concerning his mental state. The actual tests which are included

22

in the record fail to show any significant mental disability.  The testing completed by Dr. Ramakirshnana regarding plaintiff's levels of orientation, registration, attention and calculation, recall and language did not reveal any problems, as plaintiff received the maximum possible score.  Record, p. 137.  Likewise, plaintiff's answers to the Beck Inventory questions do not reveal any unusual or significant mental problems.  Record, p. 138.  Even assuming that plaintiff was suffering from the mental problems mentioned, there is no evidence or discussion by either physician as to why those problems were severe enough to render plaintiff unable to perform his job.

Dr. Lowe's assessment was predicated on the reports of Dr. Lin, Dr. Taylor and Physical Therapist Paul Turner, and on Department of Labor data concerning the ironworker's job.  Thus, the weight to be given his opinion depends in large part on the validity of the underlying reports and information.  He did not see the report of Dr. Klein.  He assumed that the reports concerning plaintiff's lack of capacity to climb, balance or walk on uneven surfaces were correct.  He performed no tests of his own.  He concluded that plaintiff lacked the capacity to perform his usual employment both as an ironworker and in other building trades.  However, in his report, he only referred to data concerning the ironworker's job, and conducted no analysis of plaintiff's physical capacity to perform specific job requirements of other building trades.

Mr. Turner, the physical therapist who evaluated plaintiff, concluded that plaintiff had problems with poor stability, and that he displayed excessive medial-lateral and anterior-posterior

23

balance disturbances that would be inconsistent and unsafe with the unlevel ground, high level platforms, and climbing associated with iron construction employment.  Mr. Turner further observed that plaintiff demonstrated poor independent balance without upper extremity support for occasional crouching.  He obviously took his observations of plaintiff's movements at face value.  There is no indication in his report that he ever considered whether plaintiff was fabricating or exaggerating the severity of his balance problems.

Mr. Turner's evaluation also indicates that plaintiff is capable of performing other types of physical tasks.  Plaintiff demonstrated positional tolerance of constant sitting, frequent push/pulling, standing, ambulation, climbing with upper extremity support, balancing, stooping, kneeling, overhead and floor level reaching in standing positions, squatting, standing trunk pivoting, and occasional crouching.  Plaintiff was able to demonstrate material handling within the Heavy category of work on both a maximum-occasional and frequent basis, as well as a tolerance of balancing activities, ladder climbing, and squatting on a frequent basis.  Mr. Turner offered no opinion as to whether plaintiff's condition would render him unsuited for jobs in other building trades.

Dr. Taylor, a neurologist, examined plaintiff on several occasions and conducted testing.  Dr. Taylor reported that plaintiff was alert, oriented and attentive with normal language and cognition.  He found that plaintiff had normal finger to nose and rapid alternating changes motion.  Although Dr. Taylor arrived at a diagnosis of sensory neuropathy, which he concluded was most

likely caused by the meningitis episode, he was puzzled by the fact that extensive testing had revealed no abnormalities.  Dr. Taylor also noted that plaintiff had normal vibratory sensation, and that he would have expected to see vibratory sensation changes in a case of sensory neuropathy.

In regard to his examination of plaintiff in August of 2003, Dr. Taylor noted that plaintiff "has actually been doing fairly well with no significant problems with weakness in his legs" and that plaintiff reported "significant improvement after increasing his exercise."  Record, p. 104.  Dr. Taylor noted that although plaintiff "continues to have problems with balance" he "has good strength in the lower extremities with normal ambulation.  He has mild problems with tandem."  In regard to plaintiff's ability to perform his job, Dr. Taylor stated, "I have concerns about him walking on high or uneven surfaces.  I would recommend he return to work with these restrictions."  Thus, Dr. Taylor, plaintiff's treating neurologist, concluded that plaintiff was capable of performing the job of ironworker so long as those restrictions were met.

Dr. Klein, a board-certified occupational medicine physician, family practitioner and independent medical evaluator, also examined plaintiff.  Dr. Klein stated that plaintiff was able to answer questions testing his recall ability, thus contradicting plaintiff's claims of memory problems.  Dr. Klein conducted tests which showed that plaintiff's "sensory examination is completely intact to vibratory and light touch and pinprick" and that his reflexes were symmetrical.  Dr. Klein also noted that there was no evidence of muscle wasting, that the strength testing was

symmetrical throughout, and that the measurements of plaintiff's calves were within normal physiologic variation.  Plaintiff had normal finger-to-nose movement and was able to stand on his toes, balance on his heels briefly, and stand perfectly still without any wavering or evidence of balance problems with his eyes closed.

Dr. Klein also reviewed Dr. Taylor's records, noting that the EMG and MRI studies revealed physiological changes which could possibly be the result of slight peripheral sensory neuropathy of unknown cause or of plaintiff's history of smoking.  Dr. Klein felt that the test results did not support the severity of plaintiff's complaints.  Dr. Klein also stated that it was difficult to pinpoint the cause of plaintiff's symptoms, noting that if plaintiff's viral meningitis had caused his symptoms, it should have caused them "earlier in the process instead of a year and a half later."  Although plaintiff walked erratically in Dr. Klein's office, Dr. Klein observed that when plaintiff left the building, "he seemed to walk with a normal gait without any seeming difficulty and walked actually rather quickly."  Dr. Klein therefore recommended that surveillance be considered before any final determination, "as it would appear that he is capable of more than he lets on."

Plaintiff argues that Dr. Klein's report is equivocal and should not be considered.  However, this is not a case where Dr. Klein changed his mind or offered self-contradictory information.  Although Dr. Klein never offered an opinion as to whether plaintiff was disabled, noting simply that it was "difficult to ascertain how much true difficulty he is having," this does not render his report suspect or without value.  His clinical observations of plaintiff's

26

movements and his reasons for doubting the validity and severity of plaintiff's complaints serve to refute the conclusory opinions of total disability rendered by other doctors and experts in this case. Dr. Klein's observations and test results were consistent with the testing conducted by Dr. Taylor, and his concerns about the test results not supporting plaintiff's reported symptoms echo many of the concerns expressed by Dr. Taylor, who also declined to give the opinion that plaintiff was totally incapable of performing his job. Dr. Klein's recommendations to the Trust concerning surveillance indicate that he suspected that plaintiff might be fabricating symptoms such as his staggered gait or exaggerating the severity of his symptoms. This concern is certainly supported by the test results and the observations of both Dr. Taylor and Dr. Klein.

The court concludes that the evidence is insufficient to establish that plaintiff is totally disabled within the meaning of the Plan's definition. Most of the expert opinions offered are conclusory in nature, based in large extent on plaintiff's subjective reports of his symptoms, not on objective testing. Dr. Taylor, the treating neurologist who was best qualified to offer an opinion concerning plaintiff's ability to perform the requirements of the job of ironworker, concluded that plaintiff could return to work so long as he avoided heights and uneven surfaces. His report of August, 2003, also calls into question whether plaintiff is permanently disabled, since Dr. Taylor noted that plaintiff's condition had improved with exercise. In fact, none of the reports in the record include any specific reasons as to why those doctors believed plaintiff's condition to be permanent. Dr. Klein's

observations are also largely inconsistent with a finding of inability to perform the job of ironworker.

The court further notes that the evidence fails to support a finding that plaintiff is also incapable of working as "any other type of building trades craftsman." In order to find that plaintiff is totally and permanently disabled under Section 3.10(b) of the Plan, the court must find not only that plaintiff's physical condition prevents him from engaging in further work as an iron worker but also "as any other type of building trades craftsman[.]"

The examinations performed by Drs. Taylor and Klein do not show that plaintiff is incapable of performing other jobs in the building trades. Mr. Turner found that plaintiff demonstrated positional tolerance of constant sitting, frequent push/pulling, standing, ambulation, climbing with upper extremity support, balancing, stooping, kneeling, overhead and floor level reaching in standing positions, squatting, standing trunk pivoting, and occasional crouching. He further noted that plaintiff was able to demonstrate material handling within the Heavy category of work on both a maximum-occasional and frequent basis, as well as a tolerance of balancing activities, ladder climbing, and squatting on a frequent basis. These observations are inconsistent with a finding that plaintiff would be incapable of performing any other job within the building trades. Dr. Lowe's job analysis was confined to plaintiff's ability to work as an ironworker; he did not conduct any independent analysis of plaintiff's ability to perform other types of building trade work.

The court concludes that the evidence in the administrative record is insufficient to support a finding that plaintiff is

28

disabled within the meaning of the Plan, so as to support his claim for disability pension benefits.  The Trust is entitled to judgment on the administrative record.

IV. Conclusion

In accordance with the foregoing, the defendant's motion for judgment on the administrative record is granted.  Plaintiff's motion for judgment on the administrative record is denied.  The clerk shall enter judgment for the defendant.


Date: November 7, 2005          _____s\James L. Graham_____
                                James L. Graham
                                United States District Judge